05-514

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 141

LOREN CURTIS HARTINGER,

              Petitioner and Appellant,

     v.

STATE OF MONTANA,

              Respondent and Respondent.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                        In and For the County of Ravalli, Cause No. DC 2003-24
                        Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Scott A. Albers, Attorney at Law, Great Falls, Montana

        For Respondent:

            Honorable Mike McGrath, Attorney General; Pamela P. Collins,
            Assistant Attorney General, Helena, Montana

            George Corn, County Attorney; William E. Fulbright, Deputy
            County Attorney, Hamilton, Montana

                    Submitted on Briefs:  August 3, 2006

                                 Decided: June 12, 2007

Filed:

                _____

                           Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Loren Curtis Hartinger (Hartinger) appeals from the order of the Twenty-First Judicial District Court, Ravalli County, denying his petition for postconviction relief. We affirm.

¶2 The issue on appeal is whether the District Court erred in denying Hartinger's postconviction claims alleging his trial counsel rendered ineffective assistance of counsel by:

¶3 a. failing to file a notice of appeal?

¶4 b. failing to file a motion to suppress Hartinger's incriminating statements?

¶5 c. failing to file a motion to suppress "newly discovered" evidence?

¶6 d. the manner in which counsel conducted voir dire?

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 On February 1, 2003, at approximately 3:15 a.m., Officer Claus James Meier (Officer Meier) of the Ravalli County Sheriff's Office (RCSO) observed Hartinger driving his vehicle on the wrong side of Highway 93 between Missoula and Hamilton, proceeding north to Missoula. Officer Meier activated his patrol car's flashing lights and siren in an attempt to stop Hartinger, but Hartinger initially failed to pull over, continuing to drive for approximately one mile and passing many convenient places to stop. Hartinger finally pulled over, but before Officer Meier could get out of his car, Hartinger sped off again. Officer Meier pursued Hartinger and radioed dispatch that a failure to yield incident was in progress. Road conditions were poor from continuing heavy rain, with water standing on the road, and Officer Meier observed that Hartinger had difficulty

2

controlling his vehicle. Hartinger eventually lost control, crossed the highway into the oncoming lane of traffic, and fishtailed along the shoulder of the southbound lane before again regaining control of the vehicle.

¶8 Hartinger then made a left-hand turn onto a highway access road that led to Meridian Road, which runs parallel to Highway 93. Hartinger made the turn immediately in front of a southbound vehicle, forcing the driver to slam on its brakes to avoid colliding with Hartinger, and, in doing so, causing the car to slide out of control into the ditch. After ensuring the passengers of that car were fine, Officer Meier continued his pursuit of Hartinger, who by then had left the paved road and was speeding along a rural, muddy road. Office Meier noted that, despite going 70 miles per hour in his patrol car at times, Hartinger was pulling away from him. The pursuit continued through the town of Victor, where Officer Meier observed Hartinger race through several intersections without stopping at stop signs or even checking for traffic.

¶9 RCSO Deputy McElderry and Sergeant Fowler joined the pursuit of Hartinger. Hartinger headed west into the mountains up a narrow, unpaved forest service road in poor winter condition, forcing an approaching vehicle to pull off the road to avoid a collision. A short time later, Hartinger's vehicle slid off the road, whereupon he fled on foot into the woods, with Officer Meier in chase. Officer Meier yelled "Sheriff's Office, stop!" but Hartinger ignored this directive. Hartinger was eventually caught by Officer Meier with Deputy McElderry assisting. Walking Hartinger back to the cars, Officer Meier noted a strong smell of alcohol emanating from Hartinger and noticed that he had difficulty maintaining his balance.

¶10 Officer Meier, Deputy McElderry, and Hartinger were part of the way back to the car when Sergeant Fowler caught up. Upon meeting them, and before Hartinger was *Mirandized*, Sergeant Fowler asked him "[w]hat he thought he was doing," and Hartinger responded, "I'm drunk and I'm trying to get away." Reaching Hartinger's car, the officers observed, in plain view, a marijuana pipe containing a green leafy substance on the floorboard, along with several opened and unopened containers of beer.

¶11 Sergeant Fowler placed Hartinger into his patrol car and transported him to the Ravalli County Detention Center (RCDC). During transport, Hartinger volunteered an apology for anyone who had been hurt during the chase and again stated that he was just drunk and wanted to get away. Upon arrival at RCDC, Hartinger was processed and booked. A standard field sobriety test was administered, but he refused to take the one-legged stand test or provide a breath sample.

¶12 Hartinger was charged with criminal endangerment, driving under the influence of alcohol and/or drugs (second offense), reckless driving while eluding, criminal possession of dangerous drugs, criminal possession of drug paraphernalia, and open container.[1] Hartinger's initial appearance was held on February 20, 2003, with public defender Kathy Anderson representing him. Mark McLaverty replaced Ms. Anderson as counsel upon her relocation to Billings. On July 8, 2003, at Hartinger's pretrial conference, Hartinger requested that the court appoint Mr. McLaverty's associate, Michael Montgomery (Montgomery), to represent him, with McLaverty as "standby" counsel, because Hartinger had seen press reporting about Montgomery's recent trial

---

[1]The State later dropped the reckless driving while eluding charge.

4

success and had also observed him while he visited other clients in RCDC. The District Court granted this request, appointing Montgomery as co-counsel, with Hartinger being directed to contact Montgomery, as Montgomery was not present at the pretrial conference.

¶13 Upon learning of his appointment, Montgomery reviewed the matter and visited Hartinger at the RCDC. He offered his assessment that the facts of the case did not look good, discussed the law, and reviewed trial strategy. Montgomery advised Hartinger to accept a plea bargain offered by the State, but Hartinger refused and subsequently asked about the statements he had made to police. Montgomery testified at the postconviction hearing that, in answering Hartinger's question, he said "we probably should've suppressed that or tried to suppress that. You can always claim ineffective against me," explaining he had said that to instill confidence in Hartinger that Montgomery was "here to advocate for [him]." However, Montgomery also testified that the statement was a "flip comment" and that, in light of Hartinger's refusal of the plea bargain and his appointment three weeks before trial, with the motion deadline already passed, he had proceeded to develop a trial theory which incorporated the statements. Further, he noted that, in his opinion, the motion would not have been "legally relevant in the light that [Hartinger] was *Mirandized* later and in custody and he made a statement, 'I was drunk.'"

¶14 On Monday, August 11, 2003, the day trial was scheduled to commence, the parties held a pretrial conference in chambers to discuss the 911 audiotape and transcript, which had been made of law enforcement's pursuit of Hartinger. The State had provided this evidence the previous Friday, and based on the "newly discovered" evidence,

5

Montgomery moved to dismiss the charges. He did not file a motion to suppress the evidence. The State responded that the audiotape and transcript were just different forms of the dispatch log earlier provided to the defense, and were not newly discovered evidence. The court denied the motion to dismiss, but granted a one-day continuance of the trial to allow the defense to prepare for the evidence.

¶15 Montgomery's approach in voir dire was to speak positively about law enforcement in order to elicit countervailing, negative comments about law enforcement from prospective jurors. Based on his assessment of the jury pool, Montgomery thought it was more beneficial to entice prospective jurors to acknowledge that police officers made mistakes, than for Montgomery, himself, to personally attack them. As a result, Montgomery elected not to challenge for cause prospective jurors Snodgrass and Cleveland, despite their "pro-police" views and instead used a peremptory challenge to exclude Snodgrass.[2]

¶16 At the conclusion of the State's case-in-chief, Montgomery moved for a directed verdict on the charges of criminal possession of dangerous drugs and criminal endangerment. The court granted the motion on the criminal possession charge, but denied the motion with regard to criminal endangerment, finding sufficient evidence to establish a prima facie case against Hartinger. In his case-in-chief, Hartinger offered evidence that police had overestimated his speed through two expert witnesses who used mathematical calculations to demonstrate that Hartinger was not driving 70 miles per

[2]A peremptory challenge was not exercised with regard to Cleveland, as he was not numbered low enough in the venire to be among the initial twenty-seven jurors from whom the jury was selected.

hour, but was actually driving closer to an average speed of approximately 45 miles per hour. Then, during settlement of jury instructions, Montgomery argued that this evidence supported an instruction for negligent endangerment in addition to criminal endangerment. The District Court denied the request, reasoning that there was no evidence Hartinger negligently, rather than purposely, engaged in the conduct of fleeing from police. The jury subsequently found Hartinger guilty of criminal endangerment, driving under the influence of alcohol and/or drugs, criminal possession of drug paraphernalia, and possessing an open container within his vehicle.

¶17 After the trial, Montgomery visited Hartinger in the RCDC, at which time Hartinger advised Montgomery that he was going to file a complaint against Montgomery for his failure to file a motion to suppress Hartinger's statements to law enforcement. Montgomery responded by telling Hartinger that he would not file Hartinger's notice of appeal, since the complaint would create a conflict of interest. Hartinger filed the complaint against Montgomery with the Office of Disciplinary Counsel, and Montgomery subsequently admitted that he had neither properly withdrawn as Hartinger's counsel of record nor perfected Hartinger's appeal. As a result, Montgomery was disciplined by the Montana Supreme Court.

¶18 On July 22, 2004, the District Court conducted a hearing on Hartinger's request for appointment of new counsel, and the court then granted Montgomery's motion to withdraw as counsel. Scott Albers (Albers) was thereafter appointed as counsel of record for Hartinger. However, after discussing the issue with Albers, Hartinger did not file a motion for an out-of-time appeal. Instead, on October 4, 2004, Hartinger filed a petition

for postconviction relief alleging ineffective assistance of counsel. Following the filing of Hartinger's petition for postconviction relief, the District Court conducted an evidentiary hearing, wherein Montgomery appeared and testified concerning his representation of Hartinger. The court denied Hartinger's petition on July 12, 2005. Hartinger appeals.

## STANDARD OF REVIEW

¶19 This Court reviews a district court's denial of a postconviction relief petition to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Turner*, 2000 MT 270, ¶ 47, 302 Mont. 69, ¶ 47, 12 P.3d 934, ¶ 47. "Claims of ineffective assistance of counsel, however, are mixed questions of law and fact." *Turner*, ¶ 47 (citing *Strickland v. Washington*, 466 U.S. 668, 698, 104 S. Ct. 2052, 2070 (1984)) ("both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact"). Therefore, our review is *de novo. Turner*, ¶ 47.

## DISCUSSION

¶20 The right to counsel in criminal prosecutions is guaranteed by the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment, and Article II, Section 24, of the Montana Constitution. *Sellner v. State*, 2004 MT 205, ¶ 18, 322 Mont. 310, ¶ 18, 95 P.3d 708, ¶ 18. However, "[i]neffective counsel may impinge the fundamental fairness of the proceeding being challenged." *Sellner*, ¶ 18 (citing *State v. Henderson,* 2004 MT 173, ¶ 4, 322 Mont. 69, ¶ 4, 93 P.3d 1231, ¶ 4). For ineffectiveness claims, we

8

have adopted the two-pronged test articulated by the United States Supreme Court in *Strickland*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064. If a defendant satisfies the first prong of the *Strickland* test and shows deficient performance by counsel, the defendant next must prove that counsel's deficient performance prejudiced his defense. *State v. Grixti*, 2005 MT 296, ¶ 26, 329 Mont. 330, ¶ 26, 124 P.3d 177, ¶ 26 (citing *State v. Lucero,* 2004 MT 248, ¶ 15, 323 Mont. 42, ¶ 15, 97 P.3d 1106, ¶ 15). "[D]efendant must show that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *Grixti*, ¶ 26 (citing *Lucero*, ¶ 15). As *Strickland* noted:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. [Citation omitted.] The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

*Strickland,* 466 U.S. at 691-92, 104 S. Ct. at 2066-67.

¶21   In order to constitute ineffective assistance, acts of counsel must stem from neglect or ignorance rather than from informed, professional deliberation. *State v.*

*Gonzales,* 278 Mont. 525, 532, 926 P.2d 705, 710 (1996). "'[T]he fact that some other lawyer . . . would have done differently . . . is not ground for branding the appointed attorney with the opprobrium of ineffectiveness . . . .'" *Grixti*, ¶ 28 (quoting *Turner*, ¶ 64) (citation omitted). As such, we must make every effort to eliminate the distorting effects of hindsight by employing "counsel's perspective at the time of trial to determine whether the conduct was reasonable." *Grixti*, ¶ 25 (citing *Turner*, ¶ 64).

¶22    **a.** ***Did the District Court err in denying Hartinger's postconviction claim that his attorney rendered ineffective assistance by failing to file a notice of appeal?***

¶23    Hartinger contends that Montgomery rendered ineffective assistance of counsel by failing to file a notice of appeal. Citing *State v. Tweed*, 2002 MT 286, 312 Mont. 482, 59 P.3d 1105, Hartinger argues that failure to file a notice of appeal when the defendant clearly intends to pursue an appeal is per se prejudicial error warranting an automatic finding of ineffective assistance of counsel.

¶24    The State counters that while it is undisputed that Montgomery failed to file a notice of appeal when he reasonably knew Hartinger desired to appeal, it is also undisputed that Hartinger knew he could seek an out-of-time appeal from this Court, was represented by counsel, and consciously chose not to pursue such an appeal. The State argues the District Court's conclusion that Hartinger waived his right to appeal is supported by substantial credible evidence, and, in any event, Hartinger was not prejudiced by the failure to file an appeal because Hartinger's claims were non-record based which needed to be raised in a postconviction proceeding.

¶25 "An out-of-time appeal is a remedy that may be available to a criminal defendant who, through no fault of his own, misses a deadline for filing an appeal." *Tweed*, ¶ 14 (citing *State v. Garner*, 1999 MT 295, ¶ 10, 297 Mont. 89, ¶ 10, 990 P.2d 175, ¶ 10). *Tweed* provides a procedure to pursue a remedial out-of-time appeal when a defendant's right to appeal is not properly preserved:

> [S]uch a motion is an original proceeding before this Court and the provisions of Rule 17, M.R.App.P., apply. In order to obtain an out-of-time appeal, the *pro se* defendant or defendant's counsel shall file a motion with this Court. . . . Upon a showing that the failure to notice a criminal appeal in a timely manner was "excusable under the circumstances," pursuant to Rule 21(b), M.R.App.P., this Court may conclude that an out-of-time appeal is the appropriate remedy. In such an event, we will order the matter remanded to the district court with an instruction to vacate and re-enter judgment to afford the defendant a second opportunity to act within the statutory time frames for filing notice of appeal.

*Tweed*, ¶ 15. Thus, a defendant must file the motion and record with this Court.

¶26 At the postconviction hearing, Hartinger testified that he was advised that an out-of-time appeal would be available to him as a result of Montgomery's failure to file a notice of appeal, that he understood what an out-of-time appeal was, and that he had discussed it with his postconviction counsel. However, Hartinger nonetheless made a conscious decision not to file a motion for an out-of-time appeal.

¶27 We conclude that substantial credible evidence supports the District Court's determination that Hartinger understood his right to file an out-of-time appeal, but that he knowingly and intentionally waived that right and instead chose to file a petition for postconviction relief. As a result of Hartinger's subsequent waiver of his right, Hartinger

11

can claim no prejudice from Montgomery's failure to timely file the appeal, and we therefore affirm the District Court.

¶28 **b.** ***Did the District Court err in denying Hartinger's postconviction claim that his attorney rendered ineffective assistance by failing to file a motion to suppress Hartinger's incriminating statements?***

¶29 Hartinger argues that Montgomery was ineffective by failing to file a motion to suppress the non-*Mirandized* statements he made to the officers. He argues that he would have been entitled to a jury instruction regarding negligent, in addition to criminal, endangerment, had his statements admitting the crime been suppressed.

¶30 The District Court found that, even if the first statement had been suppressed,[3] Montgomery believed the second statement would nonetheless have been allowed into evidence and therefore, given Hartinger's rejection of the plea bargain Montgomery had recommended, Montgomery planned to use the statements and the officers' failure to *Mirandize* Hartinger as part of his trial strategy to "give a voice" to Hartinger's theory that he had safely regulated his speeds and that police were over-zealous and mistake-prone. Thus, the District Court concluded that Montgomery had "made an informed, strategic choice regarding Hartinger's statements . . . ." Then, assuming for the sake of argument that Hartinger's statements should have been suppressed, the District Court further concluded that the outcome would not have been affected, and thus Hartinger was not prejudiced:

---

[3]The District Court found that Montgomery believed the first statement was not custodial in nature, but rather "a  rhetorical question asked by one officer after he caught up to the main chase, before he relieved his exhausted colleagues and began assisting a dirty, bleeding Hartinger up the hill."

12

> Even if Hartinger's admissions were non-existent—whether they had never been uttered or were successfully suppressed, there is more than sufficient evidence to support his conviction.

> . . . .

> Precisely because this evidence was uncontrovertable, no reasonable trial strategy could have overcome it. There is no reasonable probability that Hartinger's statements created any prejudice to his defense that he "safely regulated" his speeds while he fled from the police.

¶31 The "[c]laimed inadequacy of counsel must not be tested by a greater sophistication of appellate counsel, nor by that counsel's unrivaled opportunity to study the record at leisure and cite different tactics of perhaps doubtful efficacy. Success is not the test of efficient counsel, frequently neither vigor, zeal, nor skill can overcome the truth." *State v. Martz*, 233 Mont. 136, 140, 760 P.2d 65, 68 (1988) (citations omitted). The District Court found credible Montgomery's testimony that he did not file a suppression motion because the motions deadline had passed before his appointment, he did not believe the two statements were made within a custodial interrogation, particularly the second one, which Montgomery believed was a voluntary statement initiated by Hartinger, and he planned to use the officers' failure to *Mirandize* Hartinger as part of his trial strategy that police officers made mistakes. Given the circumstances he faced in representing Hartinger, we cannot disagree with the District Court's conclusion that Montgomery made an informed, strategic choice regarding Hartinger's statements and that it was a reasonable course.

¶32 We note that the factual differences between Hartinger's first admission, made in response to a question from an officer, and the second admission, offered voluntarily to

13

officers, may have required, in response to a motion to suppress, different analyses and different outcomes. However, even if the statements should have been suppressed, we agree with the District Court that no prejudice accrued. There was more than sufficient evidence to support Hartinger's conviction of criminal endangerment even without these statements. The record shows that the jury was presented evidence of Hartinger knowingly driving on the wrong side of Highway 93, continuing to drive after Officer Meier activated his lights and siren, speeding away from police after initially pulling over, forcing two drivers off the road in separate incidents, leading police on a chase up the mountains, careening out of control and sliding his car over an embankment, and then fleeing, on foot, in disregard to police instructions. The District Court's rejection of Hartinger's proposed instruction on negligent endangerment was not occasioned by failing to have his statements suppressed; it was foreclosed by the absence of any evidence which would support his claim that he was acting only negligently. All the evidence pointed to purposeful actions. We therefore conclude there was "no reasonable probability that the results of the proceedings would have been different but for" Montgomery's claimed ineffectiveness. *State v. Diaz*, 2006 MT 303, ¶ 25, 334 Mont. 479, ¶ 25, 148 P.3d 628, ¶ 25 (citations omitted).

¶33    **c.  *Did the District Court err in denying Hartinger's postconviction claim that his trial counsel rendered ineffective assistance by failing to file a motion to suppress "newly discovered" evidence?***

¶34    On the Friday before trial, the State turned over to the defense the 911 audiotape of the radio transmissions made during the pursuit of Hartinger and the corresponding transcript. Montgomery moved to dismiss the case based on the provision of late-

provided discovery, which he described as "newly discovered." The District Court denied the motion to dismiss, but granted a one-day continuance of the trial to give the defense additional preparation time.

¶35 Hartinger alleged that Montgomery's failure to seek suppression of the "newly-discovered" evidence, in addition to dismissal of the case, was ineffective assistance. At the postconviction hearing, the District Court found the audiotape and transcript were not "newly discovered" evidence, but were simply different forms of the 911 dispatch log earlier provided to the defense. Moreover, the court concluded that Montgomery's performance was not deficient in this regard, but that he had made an informed, strategic choice to utilize the evidence, which he believed confirmed the defense's timeline theory.

¶36 Montgomery's testimony, during the postconviction hearing, illustrated that his decision not to file a motion to suppress the 911 audiotape and transcript was made only after he determined this evidence contained information favorable to Hartinger's defense. Montgomery believed the audiotape confirmed that, consistent with his expert testimony, Hartinger's rate of speed was not the 70 miles per hour as the officers reported. Montgomery thus decided to utilize the continuance granted by the court to review the 911 audiotape with the defense witnesses and to incorporate it into their testimony. Thus, we conclude that substantial evidence supports the District Court's conclusion that Montgomery's decision not to seek suppression of this evidence was an informed, tactical decision, which did not constitute deficient performance.

¶37 **d. *Did the District Court err in denying Hartinger's postconviction claim that his trial counsel rendered ineffective assistance by the manner in which he conducted voir dire?***

15

¶38 Hartinger argues that Montgomery's voir dire performance was deficient because he failed to challenge prospective juror Snodgrass for cause, and thereafter was forced to utilize a peremptory challenge to remove Snodgrass from the jury. He points to Snodgrass's responses to questioning from the State's attorney, wherein he stated that "I've had 11 years' law enforcement experience, and I don't think I could become impartial as far as this case is concerned. . . . My views would be pro towards law enforcement."

¶39 Hartinger also maintains that prospective juror Cleveland likewise indicated a bias in favor of law enforcement, but rather than moving to challenge Cleveland for cause, Montgomery encouraged Cleveland's statements and offered his own support for them.[4] Hartinger notes that, in answering Montgomery's question about whether he would give more credit to Deputy Hochhalter, who had previously investigated a theft involving Cleveland, than a defendant's expert, Cleveland stated:

> I respect the decision generally of law officers. I believe they're in that position. They're out there every day doing their job, trying to keep this public that we have now that has changed from what it used to be – The respect of people has changed, and I believe they have a very tough job to do.
>
> My burglary was committed or a theft, I should say, was committed right in broad daylight and by one of two people. We never proved it. We haven't found – I had antique, or I mean classic car parts, and it was only two people knew where they were. Mr. Hochhalter did a very good job of

[4]Cleveland was not in the initial group of jurors on the venire from which the jury was selected, a preemptory challenge was not exercised to remove him, and he did not serve on the jury. Hartinger argues Montgomery was ineffective for failing to challenge only Snodgrass, not Cleveland, but because Hartinger also illustrates Montgomery's strategy by way of his questioning of Cleveland, we also considering that questioning.

researching this because of the amount of this type of automobile that's in the Northwest, and I really appreciate it.

Further, Hartinger points to Montgomery's response to Cleveland's answer:

> We're all here exercising our civic duties. We're all registered voters. We all have not committed any felonies. We are the living proof that the American system of jurisprudence works. This is how it works. My client gets his day in court.
>
> We are all law-abiding people here. And what you're saying about the officers, does anyone disagree with that? From my perspective, I'm right on with this gentleman here. If an officer says it, because of the line of work that they do and how they put their lives at risk every day, when they put that shield on, that commands respect. Does anyone disagree with that?

Hartinger asserts that Montgomery pursued an unreasonable trial strategy because it not only bolstered the credibility of police officers who Hartinger later needed to discredit, but also distinguished Hartinger from non-felonious, law-abiding citizens doing their "civic duties." Montgomery rehabilitated jurors instead of challenging them, and therefore, his performance was deficient and caused prejudice to Hartinger.

¶40    The State counters that Montgomery had a strategical reason for the manner of his questioning and for his decision not to challenge Snodgrass for cause. Based upon his assessment that the venire had pro-police views, he sought to avoid alienating potential jurors by criticizing police officers and instead deliberately praised police officers in order to elicit statements from the jurors themselves pointing out that police officers are not infallible, a strategy which resulted in a juror responding "policemen make mistakes, too." Thus, a decision by Montgomery to challenge Snodgrass for a bias in favor of police would have been contrary to that strategy. Further, the State argues that Hartinger

17

has offered partial quotes from the transcript, which sound damaging when taken out of context, but which do not tell the whole story.

¶41 A review of the trial transcript and Montgomery's postconviction testimony does give a larger view. As the District Court found, during Montgomery's response to Cleveland regarding law-abiding citizens, Montgomery moved to a position behind Hartinger and utilized his arms in a sweeping gesture when stating "[w]e are all law-abiding people here," in an apparent effort to include Hartinger in that category, and not distinguish him, as Hartinger contends.

¶42 Following Snodgrass's pro-police comments, Montgomery stressed the importance of the presumption of innocence and the need for the jurors to allow both sides an opportunity to fully present their case. Specifically, Montgomery used cunning questioning to encourage the jurors to think beyond their preconceptions, first using a baseball example:

> Would everyone agree with me—and if you agree with me, raise your hands—would you agree with me that there's three outs in an inning of baseball? Would you agree? Over here.
>
> . . . .
>
> *Actually, there's six outs in an inning.* Each side gets their turn at bat. That's what I'm talking about; this presumption of innocence, how it applies every time. No matter how compelling the state's case is, my man is innocent and he gets his turn at bat. Are you all with me on that? Excellent. [Emphasis added.]

In further illustration of the presumption of innocence and the need to be fair and impartial, Montgomery held up his hand and asked a prospective juror, "do you agree this is my hand?" The prospective juror answered "yes." Montgomery then responded

18

"[a]ctually, the fact is it's my hand but it's not my whole hand. Both sides, front and back, this is my hand," thereafter explaining that although the State's attorney will line up evidence in a way that suits his position, the jury must recognize that Montgomery also has the right to present evidence in order to provide the jury with the whole picture. Montgomery then engaged the prospective jurors in a leading discussion, resulting in several prospective jurors expressing their belief that police officers make mistakes. At the end of voir dire, after using these illustrative examples and drawing these answers from the prospective jurors, Montgomery returned to Snodgrass and asked him if he could be fair and impartial, and Snodgrass said he could.

¶43 While Hartinger argues that Montgomery rehabilitated a juror who could have been challenged for cause, that is not per se ineffectiveness. We have held that the decision to challenge a juror for cause in such instances may be a tactical one. As we explained in *State v. Herrman*:

> A prospective juror, responding to an inquiry during voir dire, may express a certain unfavorable bias or disclose a kinship to law enforcement, for example. The lawyer, nonetheless, in the exercise of his or her professional judgment, may determine that the ostensibly jaundiced response is outweighed by some more favorable off-the-record information that he or she has about that individual. Perhaps the lawyer conferred with his client and advised challenging the juror but the client said "no, I like the person's body language, I want him on my jury."

*Herrman*, 2003 MT 149, ¶ 29, 316 Mont. 198, ¶ 29, 70 P.3d 738, ¶ 29. Likewise, we rejected Herrman's argument that there could be no tactical justification for defense counsel to remove a juror by peremptory challenge where the juror likely could have been successfully challenged for cause:

19

> This contention does not withstand scrutiny. It ignores the fact that peremptory challenges involve a very different dynamic than challenges for cause. Challenges for cause are exercised first, they are unlimited and there is no real advantage to the timing of the challenge. As we recognized in *State v. Russell,* 2001 MT 278, ¶ 19, 307 Mont. 322, ¶ 19, 37 P.3d 678, ¶ 19, peremptory challenges are essentially a matter of trial strategy. . . . Thus, the reasons for exercising a peremptory challenge need not be the same reasons that would have prompted a challenge for cause. For example, counsel's peremptory challenge to 65-year-old juror Andy may not be based on Andy's answers to voir dire questions (which may have given rise to a challenge for cause), but rather on the fact that counsel would prefer to have a jury composed of young men rather than older men and, in eliminating Andy from the list, 28-year-old Bruce will be moved into the top twelve who will make up the final jury.

*Herrman*, ¶ 31. Thus, the issue here turns on whether Montgomery had a viable, tactical reason for deciding to not challenge Snodgrass for cause.

¶44 First, we have noted that § 46-16-115, MCA,[5] which governs challenges for cause, "does not specifically exclude law enforcement officers from serving as jurors in a criminal case. . . . The bare fact that [a juror] is connected with law enforcement does not, without more, necessitate a finding that he would not be an impartial juror." *State v. Thomson*, 169 Mont. 158, 163, 545 P.2d 1070, 1073 (1976). Here, after determining that at least ten prospective jurors had served in the military and believing that prospective jurors in Ravalli County were generally conservative, Montgomery decided to say positive things about police officers during voir dire. Montgomery testified he felt that accusing officers would be counterproductive and instead praised officers to (1) demonstrate to jurors that he was reasonable and (2) gain credibility for his case.

---

[5]Section 46-16-115, MCA, permits the challenge of a juror "having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party."

Montgomery accomplished this in some degree by eliciting comments from prospective jurors that acknowledged officers make mistakes and, further, used Snodgrass and Cleveland as an axis around which to educate the rest of the venire. Montgomery testified that he decided to dismiss prospective juror Snodgrass with a peremptory challenge instead of challenging him for cause, because he believed it was too powerful for this case, in a negative way, to state in front of the prospective jurors that Snodgrass should be removed because he gave incorrect, pro-police answers. Montgomery believed Hartinger would be seen in a more negative light by the jury if he challenged a juror who voiced pro-police views.

¶45 Counsel's reasonable trial tactics and strategic decisions are entitled to great deference when reviewed on a claim of ineffective assistance of counsel, *State v. Harris*, 2001 MT 231, ¶ 22, 306 Mont. 525, ¶ 22, 36 P.3d 372, ¶ 22, and we rarely grant relief if there is some evidence that the decision was strategic. *Henderson,* ¶ 5. Montgomery's tactics, though not successful, were part of a reasoned strategy and reaffirmed the essence of voir dire, as we explained it in *Herrman*.

¶46 Based on a totality of the record, we conclude Montgomery made informed, strategic decisions in his conducting of voir dire. We therefore determine Hartinger has not met his burden under *Strickland* to prove that Montgomery's decision to exercise a peremptory challenge, instead of a challenge for cause, constituted deficient performance.

¶47 Affirmed.

/S/ JIM RICE

21

We concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER