DA 06-0130

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 20

TONY R. NOTTI,

      Petitioner and Appellant,

   v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-05-89
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Mary Gallagher, Mary Gallagher Law Office, Missoula, Montana

      For Appellee:

         Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

         Fred R. Van Valkenburg, County Attorney; Kristen LaCroix,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  May 2, 2007

Decided:   January 29, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Appellant Tony R. Notti appeals from the decision of the District Court for the Fourth Judicial District, Missoula County, denying his petition for postconviction relief. We affirm.

¶2    We restate the issues on appeal as follows:

1.  Did defense counsel render ineffective assistance of counsel by failing to object to testimony of a crime lab technician regarding DNA evidence?

2.  Did defense counsel render ineffective assistance of counsel by failing to object to the prior consistent hearsay testimony of four state witnesses?

3.  Did defense counsel render ineffective assistance of counsel by his conduct in voir dire?

4. Did the District Court err in failing to hold an evidentiary hearing on the prior consistent hearsay statements of four state witnesses?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On September 5, 2000, the State charged Notti by information with one felony count of sexual intercourse without consent, in violation of § 45-5-503, MCA, and one misdemeanor count of theft, in violation of § 45-6-301, MCA.  These two charges arose from events of the night of May 15-16, 2000, in which Notti engaged in sexual intercourse without consent with his disabled older brother, Michael Notti.

¶4    Notti pleaded not guilty to both counts on September 11, 2000, and a two-day jury trial was conducted, beginning February 7, 2001.  The jury found Notti guilty on the count of sexual intercourse without consent and not guilty on the count of theft.  Nik

2

Geranios, an attorney with the public defenders' office, represented Notti at trial. On March 27, 2001, Notti requested a change of counsel on the ground of inadequate assistance. The District Court allowed Geranios to withdraw from representation on the basis of a breakdown in the attorney-client relationship and a second public defender was appointed to represent Notti. The District Court subsequently denied Notti's motion for a new trial on January 17, 2002, and thereafter sentenced Notti to fifty years in the Montana State Prison, with twenty years suspended.

¶5 Notti filed an appeal with this Court on the ground of ineffective assistance of counsel due to Geranios' alleged failure to file pretrial motions to prevent witnesses from repeating prior consistent statements by Notti's brother Michael and failure to object to what Notti claimed was hearsay testimony by these witnesses at trial. This Court declined to rule on Notti's ineffective assistance of counsel claim, concluding that Notti's claims could not be reviewed on appeal and were better-suited for postconviction proceedings. *State v. Notti*, 2003 MT 296, ¶ 9, 318 Mont. 146, ¶ 9, 79 P.3d 289, ¶ 9 (*Notti I*).

¶6 Notti then filed a petition for postconviction relief, raising several claims of ineffective assistance of counsel. These included failure to object to allegedly inadmissible prior consistent hearsay statements at trial, failure to object to alleged hearsay testimony of a Montana Crime Lab technician regarding DNA evidence, and ineffective assistance during voir dire. A third public defender represented Notti in this proceeding. On September 6, 2005, the District Court issued an order denying Notti's petition in part, and reserving two issues for an evidentiary hearing: (1) the crime lab

technician's alleged hearsay testimony regarding DNA evidence, and (2) defense counsel's actions during voir dire. The District Court declined to reserve the issue of alleged prior consistent hearsay testimony of four witnesses for the evidentiary hearing, and instead, found that the statements were admissible under M. R. Evid. 803(2) (excited utterances); harmless error; M. R. Evid. 803(4) (statements for purposes of medical treatment or diagnosis); and in regard to one witness, that the witness did not actually repeat any prior consistent statements. The District Court held an evidentiary hearing on the remaining two issues, and thereafter entered its Findings of Fact, Conclusions of Law, and Order denying Notti's remaining ineffective assistance claims and dismissing his petition. This appeal followed.

## STANDARD OF REVIEW

¶7     This Court reviews a district court's denial of a postconviction relief petition to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Hartinger v. State*, 2007 MT 141, ¶ 19, 337 Mont. 432, ¶ 19, 162 P.3d 95, ¶ 19. Claims of ineffective assistance of counsel are mixed questions of law and fact for which our review is de novo. *State v. Morgan*, 2003 MT 193, ¶ 7, 316 Mont. 509, ¶ 7, 74 P.3d 1047, ¶ 7. Discretionary rulings in postconviction relief proceedings, including rulings related to whether to hold an evidentiary hearing, are reviewed for an abuse of discretion. *Morgan*, ¶ 7.

## DISCUSSION

¶8     On appeal, Notti contends that Geranios failed to render effective assistance of counsel in three ways. Notti claims Geranios: (1) failed to object to alleged hearsay

4

testimony of a crime lab technician regarding DNA evidence; (2) failed to object to prior consistent hearsay testimony of four state witnesses; and (3) failed to challenge or further question jurors who presented a strong possibility of bias against Notti during voir dire.

¶9     When reviewing ineffective assistance of counsel claims, this Court applies the two-part test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Morgan*, ¶ 9. Under *Strickland*, to prevail on an ineffective assistance of counsel claim, the defendant must show:  (1) that counsel's performance was deficient, and (2) that counsel's performance was prejudicial to the defendant. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Morgan*, ¶ 9.

¶10     The primary question under the first prong of *Strickland* is "whether counsel acted within the range of competence demanded of attorneys in criminal cases." *State v. Niederklopfer*, 2000 MT 187, ¶ 19, 300 Mont. 397, ¶ 19, 6 P.3d 448, ¶ 19. Counsel's performance is strongly presumed to be within the wide range of reasonable professional assistance. *Morgan*, ¶ 10. Generally, defense counsel's "trial tactics and strategic decisions cannot be the basis upon which to find ineffective assistance of counsel." *Niederklopfer*, ¶ 19.

¶11     To prevail under the second prong of *Strickland*, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *see also Dawson v. State*, 2000 MT 219, ¶ 20, 301 Mont. 135, ¶ 20, 10 P.3d 49, ¶ 20.

¶12 A petitioner seeking to reverse a district court's denial of a petition for postconviction relief for ineffective assistance of counsel bears a heavy burden. *Morgan*, ¶ 9. Furthermore, a petitioner must satisfy both prongs of the *Strickland* test. *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63, ¶ 22, 153 P.3d 601, ¶ 22. If a petitioner makes an insufficient showing as to one prong of the test, then there is no need for the Court to address the other prong. *Adams*, ¶ 22.

¶13 ***Issue One. Did defense counsel render ineffective assistance of counsel by failing to object to testimony of a crime lab technician regarding DNA evidence?***

¶14 Notti argues that the District Court erred by failing to conclude that defense counsel's actions, with respect to DNA evidence, fell below objective standards of reasonableness and constituted ineffective assistance of counsel. The District Court determined that Geranios' failure to object to the testimony of state crime lab technician Michelle Griffin was a strategic decision and not outside the range of competence demanded of attorneys in criminal cases.

¶15 Montana Crime Lab technician Lori Hutchinson authored a report detailing DNA testing she had performed on several items taken from Michael's apartment, including a washcloth that Hutchinson determined had seminal fluid matching Notti's DNA profile. Due to her attendance at a training session, Hutchinson did not testify at trial. Instead, the State called Michelle Griffin, Hutchinson's co-worker at the crime lab, to testify regarding Hutchinson's DNA report and analysis. Griffin did not perform any of the tests herself. Griffin testified as to the findings contained in Hutchinson's report, including the presence of DNA matching that of Notti's on items seized at the crime scene. At no point

6

did Geranios object to Griffin's testimony. Geranios then proceeded to cross-examine Griffin on the results of the DNA evidence tests.

¶16 Notti cites four grounds on which the District Court should have found the testimony inadmissible: (1) the DNA evidence admitted at trial was hearsay; (2) the DNA report was testimonial and Sixth Amendment protections applied; (3) Griffin was improperly declared to be an expert and should not have relied on Hutchinson's report; and (4) the State laid an inadequate foundation for the introduction of Hutchinson's file. Notti claims that counsel's failure to object to these deficiencies constituted ineffective assistance. The State argues that all of Notti's four grounds fail because Geranios made a reasonable strategic decision not to object and that Notti cannot prove prejudice.

¶17 We shall first consider whether Geranios' conduct constituted a reasonable strategic decision. As a general rule, a defendant seeking review for ineffective assistance of counsel must "overcome the presumption that under the circumstances the action which he challenges might be considered sound trial strategy." *Niederklopfer*, ¶ 19. Generally, "Counsel's trial tactics and strategic decisions cannot be the basis upon which to find ineffective assistance of counsel." *Niederklopfer*, ¶ 19.

¶18 At the evidentiary hearing of November 14, 2005, Geranios discussed in detail his reasons for not filing any pretrial motions with respect to the DNA evidence or objecting to Griffin's testimony at trial. He testified that he had spoken with both Hutchinson and Griffin prior to trial and discussed the DNA report and results with them. When asked whether he had any concern that Griffin and not Hutchinson would testify, Geranios replied:

7

Well, we weren't -- we could have objected to her testimony, which would have resulted either in a continuance of the trial, which was not what Mr. Notti was wanting. He wanted to get this thing moving and have his trial. He was not wanting any extensive delays. So that was one issue. But the other issue was that the testimony from the crime lab dove-tailed with the Defendant's version of events.

Geranios reiterated multiple times that he believed that the evidence comported with the defense's theory of the case and buttressed Notti's explanation of the events which occurred. Geranios stated: "Bottom line was that the evidence from the crime lab . . . fit in with the theory of defense in this case and that testimony and evidence . . . was explained and actually . . . didn't hurt us, from our perspective."

¶19 In sum, Geranios offered two primary grounds for not objecting to the testimony or evidence offered at trial on the DNA results. The first was that neither he nor Notti wanted to delay the trial any further. Secondly, the fact that Griffin testified in place of Hutchinson was not a concern for Geranios as he believed the evidence and testimony supported rather than harmed his client because it comported with the defense's theory of the case.

¶20 Notti disputes the claim that he did not desire a trial continuance. At the evidentiary hearing, when asked if it mattered to him whether the trial was delayed or not, Notti replied "no." He later stated that "he would have wanted the right person in there." Even assuming that Notti and Geranios disagreed on whether the trial should be delayed so that Hutchinson could testify instead of Griffin, counsel nevertheless made a decision that the DNA evidence and testimony offered by Griffin comported with Notti's version of the events and would help the defense. Geranios explained that he did not

8

believe his cross-examination of Hutchinson would be significantly different from his cross-examination of Griffin, and that if he had any concerns about Hutchinson's background or DNA analysis, he would have objected to the DNA evidence. Geranios ultimately concluded that he could not have obtained any additional favorable information from Hutchinson that he did not get from Griffin.

¶21 We agree with the District Court's conclusion that Geranios' failure to object to Griffin's testimony at trial was a strategic decision and did not constitute conduct outside the range of competence demanded of attorneys in criminal cases. Geranios provided clear, rational grounds as to why he chose not to object to the DNA evidence or testimony at trial. As such, we need not address any of Notti's arguments about the underlying inadmissibility of the evidence. In addition, because Notti has failed to satisfy the first prong of the *Strickland* test, we need not address whether the alleged deficiency prejudiced Notti. *Adams*, ¶ 22. We hold that Notti's trial counsel did not render ineffective assistance of counsel.

¶22 ***Issue Two. Did defense counsel render ineffective assistance of counsel by failing to object to the prior consistent hearsay testimony of four state witnesses?***

¶23 Notti argues that defense counsel rendered ineffective assistance by failing to object to inadmissible prior consistent hearsay statements of four state witnesses. The witnesses were: (1) Deb Bruce—the 911 dispatcher who took Michael Notti's call on the morning of May 16, 2000; (2) Kenneth Guy—the Missoula Police Department officer who responded to Michael's initial call; (3) Dr. Joseph Weydt—the emergency room physician at Saint Patrick's Hospital who examined and treated Michael on May 16; and

9

(4) Detective Rich Ochsner—the Missoula Police Department detective who conducted the investigation and interviewed Michael. Notti alleges that these four witnesses repeated prior consistent statements of Notti's brother Michael and that these statements constituted inadmissible hearsay.

¶24 Under the Montana Rules of Evidence, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c). Under M. R. Evid. 802, "Hearsay is not admissible except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state." Rule 801 provides that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive . . . .

M. R. Evid. 801(d)(1)(A)-(B).

¶25 Notti contends that the statements offered by the witnesses were consistent with the declarant's testimony and that the statements were not offered to rebut an express or implied charge of subsequent fabrication. As such, Notti argues that the statements were not admissible as prior consistent statements of a witness and thus, constituted inadmissible hearsay. Regarding prejudice, Notti argues that if defense counsel had objected to the introduction of the four witnesses' statements, a significant portion of the State's case would have been eliminated, that the prior consistent statements bolstered

10

Michael's testimony, and that the statements were at the heart of the State's case. Notti also argues that there was no conceivable tactical reason for failing to object.

¶26 The District Court determined that the prior consistent statements of two of the four witnesses were admissible under other exceptions to the hearsay rule, the admission of another witness's statements was harmless error, and, in the case of one witness, there was no repetition of any prior consistent statement. Notti's arguments and the District Court's reasons for admitting the statements can be analyzed with respect to each witness.

### A. Statements Admitted Through Dispatcher Bruce

¶27 Notti notes that dispatcher Bruce's testimony consisted entirely of recollecting and playing a tape of the statement made to her by Michael. Dispatcher Bruce testified she was working the morning of May 16, 2000, and received a phone call from Michael. Bruce testified that Michael stated that he wanted to report a "molestation." Bruce played the 911 tape recording of Michael's call during her testimony. Though Notti claims this testimony was inadmissible hearsay because M. R. Evid. 801(d)(1)(B) did not apply, the District Court concluded that the statements were otherwise admissible under the Rule 803(2) excited utterances exception. The State argues that, given the testimony was admissible, defense counsel's performance cannot be deemed deficient for failing to object.

¶28 M. R. Evid. 803(2) states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under

11

the stress of excitement caused by the event or condition. [Paragraph breaks omitted.]

¶29 The District Court cited *State v. Cameron*, 2005 MT 32, 326 Mont. 51, 106 P.3d 1189, in support of its conclusion that Michael's statement constituted an excited utterance. In *Cameron*, the district court allowed the victim's sister to testify about a statement made to her by the victim, "Grandpa tried raping me," which the defendant argued was inadmissible as a prior consistent statement. *Cameron*, ¶ 30. The victim's statement came approximately two hours after the assault occurred, during which time the victim had walked home approximately eight miles from the scene of the assault, was weeping, and showed no sign of diminished excitement from the time of the assault to the time of her statement to her sister. *Cameron*, ¶¶ 33-34. This Court concluded that the victim's statement constituted an excited utterance as it was related to a startling event while she was still under the stress caused by the event. *Cameron*, ¶ 35.

¶30 The District Court reasoned that our decision in *Cameron* "implies that evaluation of whether a statement is an excited utterance is factually driven depending upon the particular circumstances of the victim." Notti contends that the facts in *Cameron* do not lend themselves to application of that holding here.

¶31 Michael testified that he was molested by his brother Tony at 10:00 p.m. on Mother's Day (May 15, 2000). Michael stated that he was scared because Notti held a knife to Michael's ribcage. Michael testified that, after the sexual assault, he was unable to sleep because he stayed awake to watch Notti, and repeated that he was scared. Michael said that he considered calling the police earlier than he did, but did not do so

12

because Notti told Michael to stay in bed. Michael testified that around 7:00 a.m., as Notti was getting ready to leave the apartment, he again instructed Michael to stay in bed. Michael stated he was still afraid in the morning. Finally, Michael testified that after Notti left the apartment, Michael hooked up the telephone, which Notti had disconnected, and called 911.

¶32 As in *Cameron*, the evidence supports a conclusion that Michael made his statement to Bruce while still under the stress of a startling event—sexual assault by his brother at knifepoint. Michael had stayed awake all night in fear of Notti, and had been confined to his bed by Notti's order. He testified repeatedly that he was scared, not only during the incident itself, but also afterwards into the night and morning. As soon as Notti left Michael's apartment, Michael reconnected the telephone and called 911 to report the incident. As such, we reject Notti's contention that the facts in *Cameron* require a different application of the rule here.

¶33 Because the statement made by Michael to dispatcher Bruce constituted an excited utterance under M. R. Evid. 803(2), we hold that Geranios did not perform deficiently by not objecting, and we affirm the District Court's conclusion that Geranios' failure to object did not constitute ineffective assistance of counsel.

**B. Statements Admitted Through Officer Guy**

¶34 Notti argues that the substantive portion of Officer Kenneth Guy's testimony consisted of reciting, from Guy's report, Michael's statements to Guy about the incident. Notti claims that this testimony was inadmissible hearsay. Officer Guy testified that when he interviewed Michael on May 16, 2000, Michael had initially told Guy that Notti

13

had stolen a number of personal items and money. Officer Guy testified that he then asked Michael if anything else had happened and it was then that Michael told him that Notti had approached Michael and asked him to have sex, that he and Notti had never had sexual relations in the past, and that he had told Notti he did not want to have sex. Officer Guy also testified that Michael said he was very afraid of Notti.

¶35 The State argues that the District Court correctly concluded that even if Geranios should have objected to Officer Guy's statements as inadmissible hearsay, Notti cannot establish prejudice under the second prong of the *Strickland* test. The State also notes that in his closing arguments, Geranios focused on those hearsay statements repeated by Officer Guy that worked in Notti's favor, namely, that Michael initially told Officer Guy that Notti stole Michael's tools, rather than reporting the sexual assault, and that Michael had a loaded gun he could have used to protect himself. The District Court, applying *State v. Veis*, 1998 MT 162, 289 Mont. 450, 962 P.2d 1153, concluded that because defense counsel had and took the opportunity to cross-examine Michael in regard to the substance of Officer Guy's hearsay statements, any admission of Guy's statements was harmless error. Notwithstanding the District Court's harmless error conclusion, we conclude that Notti has failed to satisfy the second prong of the *Strickland* test and show that Officer Guy's testimony was prejudicial.

¶36 The two prongs of the *Strickland* test need not be analyzed in order if the defendant has made an insufficient showing as to one of the prongs. *State v. Kearney*, 2005 MT 171, ¶ 20, 327 Mont. 485, ¶ 20, 115 P.3d 214, ¶ 20. Furthermore, if it is possible to dispose of an ineffective assistance of counsel claim on the ground of lack of

14

prejudice, then that course should be followed, to "avoid unnecessarily grading counsel's performance." *State v. Diaz*, 2006 MT 303, ¶ 25, 334 Mont. 479, ¶ 25, 148 P.3d 628, ¶ 25.

¶37 Under the second prong of *Strickland*, a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "However, it is entirely possible within the framework of *Strickland* to find attorney error which possibly prejudiced the defendant, yet conclude that such error did not rise to a level serious enough to result in a verdict unworthy of confidence." *State v. Hagen*, 2002 MT 190, ¶ 23, 311 Mont. 117, ¶ 23, 53 P.3d 885, ¶ 23. The defendant bears a heavy burden and must show trial counsel's performance was so deficient as to deprive the defendant of a fair trial. *Hagen*, ¶ 23. Notti has failed to meet this burden.

¶38 Even assuming that defense counsel had objected to Guy's testimony and the objection had been sustained, the result of the proceeding would not have been different. All the prior consistent hearsay statements repeated by Guy that Notti objects to were also testified to by Michael at trial. "[A] defendant is not prejudiced by hearsay testimony when the statements that form the subject of the inadmissible hearsay are admitted elsewhere through the direct testimony of the 'out-of-court' declarant or by some other direct evidence." *Veis*, ¶ 26 (citations omitted). Guy's repetition of Michael's prior consistent statements added no substantive content to Michael's testimony. Accordingly, we cannot conclude that Notti was prejudiced by Geranios'

15

failure to object to Guy's testimony in a manner which would have changed the outcome of the proceeding. We hold that Geranios' failure to object to Officer Guy's repetition of Michael's prior consistent statements did not constitute ineffective assistance of counsel.

### C. Statements Admitted Through Emergency Room Physician Weydt

¶39 Notti argues that emergency-room physician Joseph Weydt's testimony consisted virtually entirely of reciting, from his notes, Michael's statements to him about the incident, which Notti claims were inadmissible hearsay. The State counters by arguing that the District Court correctly determined that Dr. Weydt's testimony was admissible under M. R. Evid. 803(4)'s exception for statements for purposes of medical treatment or diagnosis.

¶40 M. R. Evid. 803(4) provides an exception to the hearsay rule for:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

¶41 This Court has ruled that for statements to be admissible under the Rule 803(4) exception, the statements (1) "must be made with an intention that is consistent with seeking medical treatment," and (2) "must be statements that would be relied upon by a doctor when making decisions regarding diagnosis or treatment." *State v. Whipple,* 2001 MT 16, ¶ 22, 304 Mont. 118, ¶ 22, 19 P.3d 228, ¶ 22. The rationale under the first factor is that a declarant seeking medical treatment will tell the truth because the declarant understands that "the effectiveness of the treatment [the declarant] receives may depend largely upon the accuracy of the information [the declarant] provides." *Whipple,* ¶ 22

16

(brackets in original). "Whether or not this two-part test has been met is an evidentiary issue which again involves the district court's discretion." *State v. Huerta*, 285 Mont. 245, 258, 947 P.3d 483, 491 (1997).

¶42    As to the first part of the Rule 803(4) test, the District Court found that the record revealed that Michael's motives in making the statements to Dr. Weydt were consistent with his seeking medical treatment. Michael called 911 at 6:42 a.m. on May 16, 2000, shortly after Notti left Michael's apartment, to report that he had been molested. Officer Guy responded to the call and Michael repeated his allegations to Guy. Shortly thereafter, Michael was transported to St. Patrick's Hospital for treatment. Dr. Weydt testified that he treated Michael at approximately 8:30 a.m., only a short time after Michael became free to seek assistance. When asked if Michael told him what had happened, Dr. Weydt testified:

> Um, he came to the emergency department at around eight, eight-thirty, the morning of May 15 [sic]. Initially said -- told the nurse that he was molested. He told me that his brother, whom he was with, had apparently been drinking, and that under, um, some threats with a knife, um, that he, in his words, made me suck his dick and then he sucked mine. Those were his words. He said again that he was threatened, told that he would be killed if he told anybody. He said that his brother also put a finger into his anus but that he wasn't injured in any way. He said that he -- there was ejaculation that was on or near his face.

Dr. Weydt further testified that Michael's demeanor was consistent with the statements he made. Dr. Weydt took Michael's history and the nurse attending Michael took a number of swabs and fluid samples from Michael. It is clear from the record that the statements Michael made to Dr. Weydt were for the purpose of seeking medical treatment and providing Dr. Weydt with the factual details required to render treatment.

17

Accordingly, the District Court did not err in determining that the first prong of the test for admissibility under Rule 803(4) was satisfied.

¶43 In regard to the second part of the test, Michael's statements to Dr. Weydt must be of a type that are reasonably relied on by a physician when making diagnosis and treatment decisions. Dr. Weydt testified:

> Q. And in the course of your examination do you take a verbal history from the patient?
> A. Yes. Always.
> Q. And is that history important in making your ultimate diagnosis?
> A. Yes. We gather as much information as we have to -- or we can.
> Q. And you rely on that information in making your ultimate opinion?
> A. Sure. Yes.

Based on the statements Michael made, Dr. Weydt determined that an STD test or any treatment for possible infection was not necessary due to the nature of Michael's complaint. In regards to Michael's statement regarding digital penetration, Dr. Weydt testified that because Michael stated that he was not injured by the penetration, and given the unlikelihood of injury from such a complaint, Dr. Weydt did not conduct an examination. The District Court found that the record reveals that Dr. Weydt relied upon Michael's statements in treating Michael. Based on what Michael told Dr. Weydt, the doctor made an informed determination as to what treatment would or would not be necessary. Without the statements made by Michael pertaining to the events of the previous night, Dr. Weydt could not have made this determination. Accordingly, the District Court did not err in determining that the second part of the Rule 803(4) test for admissibility was satisfied.

¶44 Because the hearsay statements testified to by Dr. Weydt satisfied both parts of the Rule 803(4) test, they were admissible under the exception for statements for purposes of medical treatment or diagnosis. As such, Geranios' performance was not deficient for failure to object to the statements.

### D. Statements of Detective Ochsner

¶45 Notti contends that defense counsel should have objected to Detective Ochsner's repetition of prior consistent hearsay statements as well as Ochsner's testimony regarding the consistency of Michael's statements. Notti argues that Detective Ochsner added no substantive or probative information not otherwise available through Michael and that Ochsner used the opportunity to testify in order to bolster Michael's testimony by testifying repeatedly about the consistency of Michael's story.

¶46 As to Notti's first contention, the District Court found that Detective Ochsner did not testify as to any prior consistent statements made by Michael on May 16, 2000. While Notti generally asserts that Detective Ochsner "recited parts of the prior statements," he fails to specifically identify any of these statements. Due to that failure, Notti has not carried his burden to illustrate error on the part of the District Court's conclusion to the contrary, and we will not disturb the District Court's determination that Ochsner did not attempt to testify as to any prior consistent statements of Michael.

¶47 Next, Notti offers no primary legal argument or authority as to why Geranios' failure to object to Detective Ochsner's testimony constituted ineffective assistance of counsel other than to say that the testimony bolstered Michael's statement and that M. R. Evid. 403 applies to the detective's testimony. Pursuant to the Montana Rules of

19

Appellate Procedure, an argument advanced by the petitioner "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes, and pages of the record relied on . . . ." M. R. App. P. 12(1)(f). "It is not this Court's job to conduct legal research on his behalf, to guess as to his precise position, or to develop legal analysis that may lend support to that position." *Johansen v. State, Dept. of Natural Resources*, 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24. Given Notti's failure to meet this burden, we affirm the District Court's determination that Geranios' failure to object to Detective Ochsner's statements did not constitute ineffective assistance of counsel.

¶48   *Issue Three. Did defense counsel render ineffective assistance of counsel by his conduct in voir dire?*

¶49   Notti argues that defense counsel's failure to elicit information from, or to challenge for cause, jurors Blake Mier and Gregory Kuehn, constituted ineffective assistance of counsel. The District Court found that Geranios did not challenge Jurors Mier and Kuehn because counsel did not believe he had a basis for a challenge for cause and that counsel believed they would be fair jurors.

¶50   "Defense counsel has the duty to ensure a defendant's right to a fair trial by a panel of impartial jurors." *State v. Lamere*, 2005 MT 118, ¶ 15, 327 Mont. 115, ¶ 15, 112 P.3d 1005, ¶ 15. "The purpose of voir dire in a criminal proceeding is to determine the existence of a prospective juror's partiality." *Lamere*, ¶ 15. Pursuant to § 46-16-115(2)(j), MCA, an attorney may challenge a juror for "having a state of mind in reference to the case or to either of the parties that would prevent the juror from acting

20

with entire impartiality and without prejudice to the substantial rights of either party." Voir dire allows counsel to intelligently exercise their peremptory challenges. *State v. Herrman*, 2003 MT 149, ¶ 23, 316 Mont. 198, ¶ 23, 70 P.3d 738, ¶ 23. As a general rule, "A lawyer's rationale for not challenging a juror for cause is strictly a matter of internal thought processes or, perhaps, the subject of an off-the-record discussion between the lawyer and his client." *Herrman*, ¶ 28. However, when the record adequately details the reasons for counsel's actions in voir dire, will we consider an ineffective assistance of counsel claim without the benefit of a postconviction relief proceeding. *State v. Racz*, 2007 MT 244, ¶ 28, 339 Mont. 218, ¶ 28, 168 P.3d 685, ¶ 28. With these principles in mind, Notti's arguments as to Jurors Mier and Kuehn and Geranios' explanations can be analyzed individually.

### A. Juror Blake Mier

¶51    Notti argues that Juror Mier was biased against Notti because Mier knew Notti's prosecutor from a previous case that the prosecutor handled in which Mier was the victim. Mier reported he was satisfied with the prosecution in that case. Mier ultimately served as the foreperson in Notti's trial. Notti claims that Geranios failed to inquire about Mier's expressions of bias or whether he could be a fair and impartial juror. Notti argues that minimum professional competence required further inquiry into Mier's potential bias and Geranios' failure to act fell below even the minimum profession competence required of defense counsel. Finally, Notti argues that Mier's absence from the jury panel could have changed the outcome for Notti, especially in light of Mier's prominence as foreperson.

¶52 The State argues that Geranios' conduct with respect to Juror Mier did not constitute ineffective assistance of counsel because the record reflects that Geranios prepared for voir dire and made thoughtful decisions throughout the jury selection process. At the hearing, Geranios testified that he asked Mier a number of questions about Mier's relationship with the prosecutor and also observed his demeanor. Geranios explained how a number of factors come into play in the voir dire process including body language, eye contact, and tone of voice. Geranios noted that Mier was looking at Notti, which Geranios perceived as positive.

¶53 Geranios testified that "it struck me that it did not appear that [Mier] held the State in any particular level of high regard." Geranios testified that he believed Mier would be a good and fair juror, and that Mier's demeanor gave Geranios confidence that Mier would "be a fair juror, weigh the evidence, apply the law as directed. He didn't strike me at all as having any kind of a leaning toward the prosecution." In fact, when questioned by Prosecutor LaCroix at the evidentiary hearing, Geranios testified, "there was something there with his interaction with you [Prosecutor LaCroix] -- I guess I sort of had the feeling he didn't like you, which from my perspective would probably . . . be favorable." Geranios also testified that he did not believe that a person will be biased in favor of the State just because the person is a victim of a crime that the State prosecutes. Furthermore, when asked whether there was anything that would affect his deliberations or ability to listen to the witness in the case, Mier himself replied "No" and Geranios believed Mier's statement to be sincere. Finally, Geranios testified that he did not believe

that he would have been successful in challenging Mier for cause and that there were other jurors Geranios was more concerned about.

¶54     The District Court concluded that Geranios made a sound strategic decision in not challenging Juror Mier because counsel believed that Mier's prior dealings with the prosecutor were a positive and not a negative. We agree with the District Court's conclusion. Defense counsel offered detailed and thoughtful reasons as to why he chose not to challenge Mier or question him further. It cannot be said that Geranios' performance fell below that level of competence required of counsel under the circumstances. Geranios' decision was strategic in nature, and Notti has failed to satisfy the first prong of the *Strickland* test with respect to counsel's conduct in dealing with Mier.

### B. Juror Gregory Kuehn

¶55     Notti contends that Juror Kuehn presented a propensity for bias in favor of the State due to his acquaintance with a number of incest victims in Kuehn's capacity as a schoolteacher. Notti argues that, "Unless Kuehn was to be eliminated with a peremptory, proper professional practice would have required that this set of circumstances exposing a propensity for bias in favor of the State in a family-rape case be further explored." Kuehn ultimately served on the jury. Notti contends that Geranios failed to explore this bias, and, as a consequence, Kuehn's presence on the jury prejudiced Notti.

¶56     The State argues that there was nothing about Kuehn that troubled Geranios and that his employment as a teacher and his knowledge of students who were incest victims did not demonstrate that Kuehn had a built-in bias against Notti. The District Court noted

23

that defense counsel was convinced that Kuehn would be fair to Notti. Geranios testified, "I don't believe that [Kuehn] said anything on any questioning by the State that concerned me in any significant way as far as putting me in a position where I needed to challenge him for cause." Later Geranios testified, "I guess we're kind of discussing some intangibles, but [Kuehn] did not seem like he would be biased; I think he would weigh the evidence fairly." When asked whether he believed he would have been successful in a motion to excuse Kuehn because he was a schoolteacher who taught children who were the victims of molestation, Geranios replied:

> Based on the answers that he gave and my sense of him, um, no. But, again, I don't know that I was even looking at -- at that prospect very seriously because I was satisfied with his answers, I was satisfied that he was probably going to be a fair juror.

Geranios also testified that there were other jurors that concerned him more than Kuehn and he ultimately felt that Kuehn would be a fair juror.

¶57 The testimony of Geranios at the hearing supports the conclusion that he made an informed strategic decision not to challenge Kuehn or question him further. As such, Notti has failed to satisfy the first prong of the *Strickland* test with respect to counsel's conduct in dealing with Kuehn. The District Court did not err in concluding that Geranios did not render ineffective assistance of counsel during voir dire.

### C. Cumulative Error

¶58 Finally, Notti argues that prejudice accrued through the individual and cumulative effects of defense counsel's actions and omissions. Notti cites *State v. Jefferson*, 2003 MT 90, 315 Mont. 146, 69 P.3d 641, for the proposition that it is appropriate to

24

consider the circumstances of the entire proceeding to determine whether Notti was prejudiced. Notti contends that the cumulative effect of Geranios' failure to object to DNA evidence, his failure to object to the prior consistent statement testimony of the four state witnesses, and his actions and omissions in voir dire was prejudicial to Notti. However, after reviewing these contentions individually, we concluded above that either no error or no prejudice arose from any of them. Therefore, there can be no "cumulative error" here, and we need not consider the argument further.

¶59 ***Issue Four. Did the District Court err in failing to hold an evidentiary hearing on the prior consistent hearsay statements of four state witnesses?***

¶60 Notti asserts that the District Court erred by failing to follow the law of the case when it did not hold an evidentiary hearing on all of Notti's postconviction claims—specifically, his claims regarding Geranios' failure to object to the prior consistent hearsay statements of the four state witnesses. As mentioned above, in *Notti I* we determined that a postconviction relief proceeding was necessary to address Notti's ineffective assistance of counsel claims because the record did not reveal the reasons for the challenged actions of defense counsel. *Notti*, ¶¶ 9-10.

¶61 Notti argues that the District Court should be reversed for disregarding the law of the case as established in *Notti I*. The law of the case doctrine holds that:

"[W]here, upon an appeal, the Supreme Court, in deciding a case presented states in its opinion a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case, and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal . . . ."

*Zavarelli v. Might*, 239 Mont. 120, 124, 779 P.2d 489, 492 (1989) (quoting *Carlson v. Northern Pacific Railway Co.*, 86 Mont. 78, 281 P. 913, 914 (1929)). Notti claims that in *Notti I*, "this Court reviewed the trial transcript and ruled that an evidentiary hearing was necessary to address issues raised by Appellant because the record did not establish on-record the reasons for any of the challenged actions of trail [sic] counsel." While we agree with Notti's contention that courts are mandated to follow the law of the case, we first note that Notti has overstated our actual holding in *Notti I*.

¶62    In *Notti I*, we concluded that defense counsel's alleged deficiencies could not be reviewed on direct appeal and held that "the ineffective assistance of counsel claim is dismissed without prejudice to its being raised in a post-conviction relief proceeding." *Notti*, ¶¶ 9-10. Notably, we did not expressly mandate that a hearing must be conducted, but only that Notti's claims could be pursued.

¶63    The law does not require district courts to conduct a hearing in every post-conviction proceeding. "If a district court finds that the allegations in a petition are without merit or would not otherwise entitle a petitioner to relief, a district court may deny an application for postconviction relief without holding an evidentiary hearing." *State v. Cobell*, 2004 MT 46, ¶ 12, 320 Mont. 122, ¶ 12, 86 P.3d 20, ¶ 12. "The decision to hold an evidentiary hearing in a postconviction relief proceeding is discretionary and is reviewed for abuse of discretion." *Ford v. State*, 2005 MT 151, ¶ 6, 327 Mont. 378, ¶ 6, 114 P.3d 244, ¶ 6.

¶64    Here, the filing of Notti's postconviction relief petition in the District Court was followed by the filing of briefing by both parties which presented detailed and

26

comprehensive arguments in respective support of, and opposition to, the merits of Notti's claims. This extensive flushing out of the claims with arguments for and against was appropriate and as it should be. However, the District Court was provided with a substantially different presentation of the case than what was presented to this Court in *Notti I*. In that appeal, the State primarily offered a procedural defense, arguing that "the record does not reveal the basis upon which the State offered the testimony, nor the reason why Geranios did not object to it." Notti could not refute this contention which, under our case law, prevents claim review on direct appeal. Then, in the District Court, the State offered positions against the merits of Notti's postconviction claims: that Geranios was not required to object because the statements were admissible under several hearsay exceptions, and that because Geranios had relied on a number of the witnesses' statements for use in Notti's defense, his decisions were strategic in nature. These arguments were briefly mentioned in the State's appellate briefing in *Notti I*, but only as alternatives to its primary procedural argument.

¶65 After reviewing the extensive postconviction filings, the District Court ordered a hearing on two of Notti's claims. First, regarding the trial testimony of crime lab technician Griffin, the District Court determined from Geranios' hearing testimony that he had made a strategic decision not to object because the testimony supported his theory of the case (See Issue One, *supra*). Second, in regard to Geranios' actions and omissions during voir dire questioning, the District Court again concluded from Geranios' hearing testimony that he had made reasonable strategic decisions (See Issue Three, *supra*).

27

Concluding that a basis for decision on Notti's other four claims existed without a hearing, the District Court decided those without taking further evidence.

¶66 A decision by this Court to the effect that a claim may be pursued in a postconviction relief proceeding does not necessarily create the right to a hearing as a matter of law of the case. The need for a hearing remains a discretionary call by the district court after review of the claims. Further, even if we were to conclude that the law of the case doctrine was implicated in a particular case, we review a district court's actions regarding law of the case issues under an abuse of discretion standard. *State v. Gilder*, 2001 MT 121, ¶ 8, 305 Mont. 362, ¶ 8, 28 P.3d 488, ¶ 8. "Law of the case should not be applied woodenly in a way inconsistent with substantial justice." *U.S. v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987).

¶67 Given our decisions herein on the merits of Notti's claims, wherein we conclude that the District Court correctly analyzed and denied those claims, the outcome would not have been any different had a hearing been conducted. Further, Notti does not identify any additional evidence he would have presented had a hearing been conducted on those claims. Consequently, we conclude that the District Court did not abuse its discretion in conducting a hearing for only two of Notti's claims.

¶68 Affirmed.

/S/ JIM RICE

28

We concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JOHN WARNER